# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GEORGE B. KEAHEY,                                    :
                                                     :
                          Plaintiff,                 :        CIVIL ACTION
              v.                                     :
                                                     :
                                                     :
BETHEL TOWNSHIP, PENNSYLVANIA , *et al.*,  :        NO. 11-7210
                                                     :
                          Defendants.                :
                                                     :


## MEMORANDUM

BUCKWALTER, S. J.                                          February 15, 2012

Currently pending before the Court is the Motion of Defendants Bethel Township, Pennsylvania, *et al.* ("the Township")[1] to Dismiss Plaintiff's Amended Complaint. For the following reasons, the Motion is granted in part and denied in part.

## I.      FACTS AND PROCEDURAL HISTORY

This action stems from a series of incidents that occurred between the Plaintiff, George B. Keahey ("Plaintiff" or "Keahey") and several police officers of the Bethel Township Police Department in Delaware County, Pennsylvania. According to the facts set forth in the Amended Complaint, on November 25, 2009, several police officers arrived at Keahey's home in response to

---

[1] In addition to asserting claims against Bethel Township, Plaintiff also brings claims against eight police officers of the Township: Lieutenant W. Coyle 8302, Corporal C. Kimbel 8343, Patrol Officer B. Buck 8366, Patrol Officer Register 8324, Patrol Officer Mervine 8326, Patrol Officer Bradshaw 8338, Patrol Officer L. Stackeni, and Patrol Officer John Doe. For clarity and ease of reference, the Court will collectively refer to the Township and officers as the "Defendants" when addressing matters relevant to all defending parties. In regards to claims that are only relevant to a specific defending party, the Court will identify the individual party to whom that claim applies.

a 911 call made by his wife, Wendy Keahey ("Wendy").[2]  (Am. Compl. ¶ 17.)  Keahey was sitting

alone in his sun room when several officers approached the house and demanded entry.  (Id. ¶ 20.)

Plaintiff complied with their request.  (Id. ¶¶ 20, 22.)  Plaintiff asserts that, at the time, his wife was

visibly intoxicated from drugs and alcohol to the point of being unable to stand.  (Id. ¶ 23.)  Plaintiff,

a licensed attorney in the Commonwealth of Pennsylvania, therefore requested that the officers make

note of this in their police report, but was told to "mind his own business."  (Id. ¶¶ 24, 32.)  At

Wendy's request, the police officers then removed Keahey from his home, placed him in the back

of a marked patrol car with no door handles, and drove off of his property.  (Id. ¶¶ 25–26.)  The

officers eventually deposited Plaintiff in the parking lot of a fast food restaurant in another township,

where he was left in the rain without a jacket or socks. (Id. ¶ 27.)

        The following day, November 26, 2009, Keahey attempted to return to his home, but Wendy

refused to allow him on the premises. (Id. ¶ 29.)  Plaintiff therefore left the property in a 2003 Ford

F-150 truck ("the truck") that had been purchased during the course of his marriage to Wendy, which

he claims was lawfully registered to and insured by him.  (Id. ¶ 30.)  Plaintiff thereafter received a

telephone call on his personal cell phone from several police officers, who threatened to arrest him

for unauthorized use of the truck if he did not immediately return it to Wendy.  (Id. ¶ 31.)  The

officers also apparently issued a stop-and-seize order over the police radio network instructing other

police units to stop and seize the truck if they encountered it.  (Id. ¶ 33.)  Keahey did not return the

truck.  (Id. ¶ 34.)  The next day, the District Attorney of Delaware County allegedly informed the

officers that Keahey was in lawful possession of it and entitled to use it, and that Wendy would need

to file a civil petition through her divorce attorney if she wished to gain possession of the truck.  (Id.)

---

        [2] The content of this phone call and the reason for Wendy's alerting the police remains
unknown at this stage in the proceedings.

Approximately two months later, however, Wendy "stole" the truck while it was parked in front of a home on a private road where Plaintiff was attending a social event. (Id. ¶ 35.) Several of Keahey's personal items were inside the truck at the time, including his wallet, identification, credit cards, suit jacket, business cell phone, and numerous confidential legal documents and files related to his legal practice. (Id. ¶¶ 36–38.) Keahey reported the alleged theft to the police, but was told that Wendy was in lawful possession and could return Keahey's personal items when it was convenient for her to do so, despite their confidential and sensitive nature. (Id. ¶¶ 39–42.)

Plaintiff subsequently filed a petition in the Court of Common Pleas in Delaware County for return of the truck. (Id. ¶ 43.) While his petition was pending, Plaintiff asserts that he was "forced to" borrow and rent transportation so that he could continue to operate his legal practice. (Id. ¶ 44.) On February 17, 2010, the Court of Common Pleas issued a temporary order granting Keahey permission to use another car he owned with his wife, a 1987 Ford Mustang ("the Mustang"). (Id. ¶ 45.) Keahey took possession of the Mustang on February 22, 2010. (Id. ¶ 46.) Less than one month later, he apparently received a phone call from an officer of the Bethel Township Police Department on a Friday night informing him that he needed to immediately return the Mustang to Wendy or else he would be arrested for its unlawful use. (Id. ¶ 47.) Keahey explained that he had a temporary court order for use of the Mustang, already had filed a court order for its permanent use, and offered to meet with the officer in person to discuss the matter because he was at dinner with a client. (Id. ¶ 48.) Later that night, the officer called Keahey again, stating that he had obtained a "hard copy" of the court order and that, despite this fact, Keahey still needed to immediately return the car or else risk arrest. (Id. ¶ 49.) Keahey again tried to explain that he was lawfully permitted to use the Mustang, and suggested that the officer contact the court that issued the order to confirm. (Id. ¶ 50.) Nonetheless, the officer called Keahey the following day and demanded that he

3

immediately return the Mustang to Wendy.  (Id. ¶ 51.)  When Keahey once again tried to explain that he had a court order, the officer allegedly told him that "he did not care" and that he would have him arrested if he did return the vehicle "now."  (Id.)

On April 22, 2010, Plaintiff obtained a different court order from the Court of Common Pleas granting him access to the home he previously shared with his wife.  (Id. ¶ 52.)  According to the Plaintiff, Wendy was ordered not to remove any personal property from the home prior to Keahey's scheduled retrieval date.  (Id.)  When Keahey entered the property on April 24 and/or 25, 2010, he claims that several valuable personal items were missing and that Wendy refused to return them. (Id. ¶¶ 52, 53.)  Plaintiff thereafter notified Wendy and her attorney that certain items were missing, and requested their return within three weeks.  (Id. ¶ 54.)  When Wendy failed to return the property, Plaintiff reported them as stolen to the police on May 13, 2010.  (Id. ¶¶ 54, 55.)  On June 1, 2010, Keahey requested a copy of the official police report, which he claims states that Wendy told the police that Keahey was not lawfully entitled to enter the premises and obtain the items.  (Id. ¶¶ 56, 57.)  At this time, Plaintiff also inquired as to the status of the investigation of his stolen property, and was told that the investigation remained ongoing.  (Id. ¶ 56.)  After waiting over a month and making numerous phone calls to several different officers regarding his case to no avail, Keahey filed a private criminal complaint with the Delaware County District Attorney to recover his personal property.  (Id. ¶ 58.)  On August 9, 2010, the District Attorney allegedly dropped Keahey's private complaint because the police "did not want to investigate or prosecute [Wendy]."  (Id. ¶ 60.)  On August 10, 2010, Plaintiff filed a petition with the Court of Common Pleas "in an attempt to force the prosecution of his missing personal items."  (Id. ¶ 61.)  Plaintiff also sought to file a claim for the items with his insurance carrier at approximately this time, but was prevented from doing so because the police never completed their formal investigation of the incident.  (Id. ¶ 59.)

Plaintiff filed a pro se Complaint in this Court on November 18, 2011.  Defendants moved to dismiss on December 12, 2011.  Plaintiff thereafter filed an Amended Complaint on December 28, 2011.  The Amended Complaint includes the following six counts: (1) violations of Plaintiff's civil rights secured by the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983; (2) violations of Plaintiff's civil rights secured by the Fourteenth Amendment and § 1983; (3) a conspiracy to deprive Plaintiff of his federal constitutional rights pursuant to § 1983; (4) false imprisonment; (5) harassment; and (6) the malicious abuse of process.  The Defendants filed the present Motion to Dismiss the Amended Complaint (the "Motion") on January 6, 2012.  Plaintiff filed a Response in Opposition ("Response") on January 24, 2012.  The Court will now consider the merits of Defendant's Motion.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555. It emphasized that it would not require a "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  Id. at 570.

In the subsequent case of Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), the Supreme Court enunciated two fundamental principles applicable to a court's review of a motion to dismiss for failure to state a claim.  First, it noted that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> at 1949. Thus, although "[Federal] Rule [of Civil Procedure] 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." <u>Id.</u> at 1950. Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." <u>Id.</u> "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u>

Notwithstanding the foregoing, nothing in <u>Twombly</u> or <u>Iqbal</u> has altered some of the fundamental underpinnings of the Rule 12(b)(6) standard of review. <u>Arner v. PGT Trucking, Inc.</u>, No. Civ.A.09-0565, 2010 WL 1052953, at *2 (W.D. Pa. Mar. 22, 2010); <u>Spence v. Brownsville Area Sch. Dist.</u>, No. Civ.A.08-0626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008). Federal Rule of Civil Procedure 8 requires only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. Fed. R. Civ. P. 8; <u>Phillips v. Cnty. of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008). Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." <u>Buck v. Hampton Twp. Sch. Dist.</u>, 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." <u>Pinkerton v. Roche Holdings Ltd.</u>, 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.   DISCUSSION

### A.   Counts I and II—The Section 1983 Claims

Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be

subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C.A. § 1983. The statute itself does not independently create substantive rights, but rather merely "provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." Kopec v. Tate, 361 F.3d 772, 775–76 (3d Cir. 2004) (internal citation omitted); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002); Bush v. Lancaster City Bureau of Police, No. Civ.A.07-3172, 2008 WL 3930290, at *3 (E.D. Pa. Aug. 26, 2008). Federal law requires a plaintiff to satisfy two steps in order to properly establish a § 1983 claim: (1) the deprivation of a constitutional right or other federal law, and (2) that a "person acting under the color of state law" is responsible for the alleged deprivation. Collins v. City of Harker Heights, 503 U.S. 115, 119–120 (1992).

In the instant case, Plaintiff claims that various officers of the Bethel Township Police Department engaged in conduct committed under the color of state law that deprived him of due process and his rights to be free from the unreasonable and illegal seizure of his person and personal property pursuant to the Fourth and Fourteenth Amendments. (Am. Compl. ¶¶ 66–100.) Plaintiff also claims that the Township failed to properly train, supervise, and discipline its police officers. (Id. ¶ 63.) In response, Defendants assert that dismissal is required because the individual officers named in the Complaint are protected by the qualified immunity doctrine and, according to the Supreme Court's holding in Monell v. Department of Social Services, 436 U.S. 658 (1978) the Township itself cannot be held liable under a respondeat superior theory of liability. (Def's Mot. to Dismiss Am. Compl. 4, 12.) In the alternative, Defendants move to dismiss these claims on the grounds that they do not rise to the level of a constitutional violation for § 1983 purposes. The Court considers each claim and affirmative defense in turn.

### 1.      Fourth Amendment—Seizure of Person (Count I)

Broadly stated, the Fourth Amendment[3] prohibits the unreasonable seizure of a person absent a judicially-sanctioned warrant supported by probable cause.[4]  See Orsatti v. N.J. State Police, 71 F.3d 480, 482 (3d Cir. 1995).  "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"  Kaupp v. Texas, 538 U.S. 626, 629 (2003) (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991); Michigan v. Chesternut, 486 U.S. 567, 569 (1988)).  The Supreme Court has articulated numerous examples of circumstances that constitute a "seizure" within the context of the Fourth Amendment, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."  Kaupp, 538 U.S. at 630 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).  In Kaupp, several police officers arrived at the defendant's home in the early morning hours without an arrest warrant.  Id. at 628.  Upon entry into the home, the officers went to the defendant's bedroom, woke him with a flashlight, and told him that "we need to go and talk."  Id. The officers handcuffed the defendant, lead him outside to a patrol car while he was shoeless and dressed only in a T-shirt and boxer shorts in January, and proceeded to drive past the crime scene.

---

[3]  "The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons . . . to be seized."  U.S. Const. amend. IV.

[4]  The Fourth Amendment is made applicable to the states through the Fourteenth Amendment.  See Albright v. Oliver, 510 U.S. 266, 272–73 (1994) (citing Mapp v. Ohio, 367 U.S. 643 (1961)) (further citation omitted).

Id.  The Supreme Court found that the officers' conduct in Kaupp constituted a seizure within the meaning of the Fourth Amendment.  Id. at 630–31.

The facts in Kaupp are similar to those alleged by Plaintiff in the case at hand.  In his Amended Complaint and Response, Keahey asserts that armed police officers demanded entry into his home without a warrant, removed him against his will, placed him in the back of a marked patrol car with no door handles, and then left him stranded in a parking lot in another township without socks or a coat in November.  (Am. Compl. ¶¶ 20, 25–27.)  As such, at this stage in the proceedings, the alleged facts are sufficient to indicate that Defendants' actions here may have constituted a violation of Keahey's Fourth Amendment rights, and his claim therefore survives a motion to dismiss.

### 2.    Fourth Amendment—Seizure of Property[5]

The Fourth Amendment also protects individuals from unreasonable seizures of their property.[6]  "[A] Fourth Amendment 'seizure' of personal property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'"  Brown v.

---

[5] In his Amended Complaint, Plaintiff does not delineate a separate Count for his unconstitutional seizure of personal property claim based on the Fourth Amendment.  Rather, Plaintiff makes various assertions throughout Counts I and II that Defendants engaged in the unconstitutional seizure of his personal property based on both the Fourth and Fourteenth Amendments.  Despite the fact that Plaintiff has not created a separate category for his Fourth Amendment property claims, at this early stage of the proceedings, the "court should [ ] inquire . . . only whether [plaintiffs] are entitled to offer evidence to support their claims."  Roskos v. Sugarloaf Twp., 295 F. Supp. 2d 480, 483 (M.D. Pa. 2003) (internal citation omitted).  Keahey has provided enough evidence in his Amended Complaint to support a claim for unconstitutional seizure of his property under the Fourth Amendment.  For purposes of clarity, the Court considers these claims separately from his other assertions based on the Fourth and Fourteenth Amendments.

[6] "The right of the people to be secure in their . . . houses, papers, and effects, against unreasonable . . . seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the . . . things to be seized."  U.S. Const. amend. IV.

Muhlenberg Twp., 269 F.3d 205, 209 (3d Cir. 2001) (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)); see also Gale v. Storti, 608 F. Supp. 2d 629, 633 (E.D. Pa. 2009).  When analyzing whether or not such an interference occurred, "it is irrelevant that the officers do not currently have custody of the property," so long as "the officers participated in the seizure as alleged."  Id. at 633. In Gale, several police officers assisted a landlord in the eviction of a tenant.  Id. at 632.  The officers entered the premises without the tenant's consent and instructed him to vacate the property immediately or else risk being arrested for trespassing.  Id.  The police also stood by as the landlord changed all the locks on the property.  Id.  The tenant ultimately vacated the premises, but never retrieved $50,000 worth of his personal property.  Id.  He therefore sued the officers and the municipality, claiming that the officers illegally seized his property in violation of the Fourth and Fourteenth Amendments.  Id. at 633.  The court agreed, stating that, even though the officers themselves did not actually change the locks or retain custody of the tenant's property, their participation in the alleged conduct was enough to constitute an unreasonable seizure of property for purposes of surviving a motion to dismiss.  Id. at 633–34.

In this case, Plaintiff asserts that the officers engaged in an illegal seizure of his personal property by: (1) allowing Wendy to retain his cell phone, wallet, clothing, and confidential legal files, (2) demanding that he return the truck to Wendy even after the District Attorney instructed the officers that he was lawfully entitled to use it, (3) ordering him to immediately turn over the Mustang despite having a valid court order for its use, (4) failing to properly investigate the valuable personal items missing from his marital home, (5) "impermissibl[y] and unreasonabl[y] us[ing]" his personal cell phone,[7] and (6) "instruct[ing]" him that he could not return to his home.  (Am. Compl. ¶¶

---

[7] In making this allegation, it is unclear if Plaintiff is referring to the officer's repeated calls to his cell phone or to his allegation that various officers "assisted" his wife in retrieving confidential client communications from his cell phone.  (Am. Compl. ¶¶ 31, 41, 42, 47–51.)

82–86.)  Just as in <u>Gale</u>, even though the officers themselves did not seize the property or maintain custody of it, their participation in the alleged conduct, if true, could constitute a "meaningful interference" with Keahey's individual possessory interest in his property.  Thus, Plaintiff has sufficiently stated a claim under § 1983 that his Fourth Amendment right against the unreasonable seizure of his property was violated under these circumstances.

### 3.    Fourteenth Amendment—Due Process (Count II)

The Fourteenth Amendment prohibits states from depriving individuals of life, liberty, or property without due process of law.[8]  <u>See</u> <u>Robb v. City of Phila.</u>, 733 F.2d 286, 292 (3d Cir. 1984).  As interpreted by the Supreme Court, the Fourteenth Amendment provides for both substantive and procedural due process.  <u>See</u> <u>Planned Parenthood of Se. Pa. v. Casey</u>, 505 U.S. 833, 846–47 (1992).  It is well established that "possessory interests in property invoke procedural due process protections."  <u>Abbott v. Latshaw</u>, 164 F.3d 141, 146 (3d Cir. 1998) (internal citation omitted).  "At the core of procedural due process jurisprudence is the right to advance notice of significant deprivations of liberty or property and to a meaningful opportunity to be heard."  <u>Id.</u>  (internal citations omitted).  In order to properly state a claim upon which relief can be granted, a plaintiff "must establish that the officers were acting as state actors when they deprived him of a property interest to which he had a legitimate claim of entitlement without the process he deserved."  <u>Gerhart v. Commonwealth of Pa.</u>, No. Civ.A.09-1145, 2009 WL 2581715, at *4 (E.D. Pa. Aug. 13, 2009) (quoting <u>Abbott</u>, 164 F.3d at 146)).  In <u>Abbott</u>, a police officer helped a woman take possession of her ex-husband's vehicle.  The Third Circuit found that the plaintiff had a "strong claim" against the officer for violating his procedural due process rights because the officer failed to give him advance

---

[8] "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV.

11

notice and an opportunity to be heard prior to seizing the vehicle.  Abbott, 164 F.3d at 147.

Here, the Court finds Keahey's claims to be analogous to those of the Plaintiff in Abbott. As Keahey has clearly alleged that the officers were involved in the deprivation of his various personal items by failing to provide him with advance notice and an opportunity to be heard, there is no question that Plaintiff has sufficiently stated a claim for a violation of his procedural due process rights.

Plaintiff's substantive due process claims, however, are less clear.  "To establish a substantive due process claim, a plaintiff must prove . . . the government's deprivation of [the] protected interest [at issue] shocks the conscience." Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008) (internal citation omitted).  While the Third Circuit has indicated that there is no "calibrated yardstick" upon which behavior can be measured and that the degree of wrongfulness depends upon the particular facts of each case, Kaucher v. Cnty. of Bucks, 455 F.3d 418, 425 (3d Cir. 2006) (internal citation omitted); Nicini v. Morra, 212 F.3d 798, 810 (3d Cir. 2000) (internal citation omitted), the Supreme Court has stated that only when the state actor's behavior is "*so egregious*, *so outrageous*, [then] it may fairly be said to shock the contemporary conscience." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998) (emphasis in original).

In this case, Keahey asserts that the officers' actions were "motivated by an evil motive or intent" and were "callously indifferent" to his constitutional rights.  (Am. Compl. ¶ 96).  While the officers' actions may have been inappropriate and overly aggressive at times, they do not rise to the level of being "so egregious" and "so outrageous" as to shock the contemporary conscience.  See Reese v. Kennedy, 865 F.2d 186, 188–89 (8th Cir. 1989) (police officers' forced eviction of plaintiff from her home did not rise to the level of shocking the conscience).  No physical force, coercion tactics, or extreme threats were made to deprive Plaintiff of his property.  As such, Plaintiff has not stated a valid claim for a deprivation of his substantive due process rights here.  This claim is, therefore, dismissed.

### 4.      Municipal Liability

In the seminal case of <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), the Supreme Court held that § 1983 applies to municipalities and other local government units.  <u>Id.</u> at 690.  To impose § 1983 liability on such a governing body, a plaintiff must show that the municipality engaged in some "action pursuant to [an] official municipal policy . . . [that] caused a constitutional tort."  <u>Id.</u> at 691.  However, "it is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality."  <u>Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown</u>, 520 U.S. 397, 404 (1997).  Rather, the plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.  <u>Id.</u>; <u>see also</u> <u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 850 (3d Cir. 1990) (plaintiff carries burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the constitutional deprivation challenged) (internal citation and quotations omitted).

One way that a plaintiff can establish such an official policy is by demonstrating that the governing body maintained a policy of inadequate training or supervision.  <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378 (1989).  In <u>Canton</u>, the Supreme Court held that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality . . . can a city be liable for such a failure under section 1983."  <u>Id.</u> at 389.  Once a plaintiff identifies a municipal policy, he must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  <u>Brown</u>, 520 U.S. at 404.  If the policy does not facially violate federal law, causation can only be established by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  <u>Id.</u> at 407 (internal citations omitted); <u>see also</u> <u>Frohner v. City of Wildwood</u>, No. Civ.A.07-1174, 2008 WL 5102460, at *11 (D.N.J. Dec. 1, 2008).  The Supreme Court has cautioned, however, that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees."  <u>Brown</u>, 520 U.S. 397, 405 (1997).

In this case, Plaintiff alleges that the Township[9] failed to "properly train, supervise and discipline" its police officers, thereby causing the alleged deprivation of his constitutional rights.[10] (Am. Compl. ¶¶ 62, 63.)  In order to prevail on this claim, Keahey would need to show that the Township was deliberately indifferent "to the rights of people with whom the police c[a]me into contact."  <u>Canton</u>, 489 U.S. at 388.  To properly do so, Keahey would need to prove that the Township had a pattern of engaging in constitutional violations such as those present in this case. <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 244 (3d Cir. 2004) (citing <u>Berg v. Cnty. of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000)).  Keahey cannot, however, prove such a pattern without a sufficient period of discovery to adduce this evidence.  As such, the issue of whether the Township maintained a policy that failed to properly train its police officers is still too premature for the Court to decide at this time.  The Defendants' Motion on these grounds is therefore denied.

### 5.    The Qualified Immunity Doctrine

Defendants allege that the individual officers cannot be held liable for their actions in this case because they are protected by the cloak of qualified immunity.[11] (Def.'s Mot. to Dismiss Am.

---

[9] Although the Bethel Township Police Department is not listed as a Defendant in the caption of this case, Plaintiff lists it as a "party" to the suit under the section of his Amended Complaint entitled "Parties." (Am. Compl. ¶ 3.)  Municipal police departments are not proper defendants in § 1983 actions because they do not maintain a separate identity from the municipality of which they are a part.  <u>See Martin v. Red Lion Police Dep't</u>, 146 Fed. App'x 558, 562 n.3 (3d Cir. 2005) (internal citation omitted).  Thus, the Bethel Township Police Department is not a proper defendant, and Plaintiff's claims against it are dismissed.

[10] Plaintiff's claim based on a failure to train is not listed under any of the formal Counts put forth in his Amended Complaint, but rather appears in the section immediately preceding Count I, entitled "Background and General Allegations."  At this stage of the proceedings, the Court is required to view all allegations in the light most favorable to the Plaintiff.  Thus, the Court considers this "general allegation" in conjunction with Plaintiff's § 1983 claims.

[11] As an initial matter, Plaintiff has not specified whether he is suing the officers in their "individual" or "official" capacity.  Suits against officers acting in their individual capacity "seek to impose individual liability upon a government officer for actions taken under color of state law."  <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991).  Moreover, plaintiffs suing officials in their individual capacity "need not establish a connection to governmental 'policy or custom[.]'"  <u>Id.</u>

Compl. 4–5.)  "[D]istrict court[s] should resolve any immunity question at the earliest possible stage of any litigation [because] . . . the qualified immunity doctrine provides the official with immunity from suit, not simply trial[.]"  Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995) (internal citations omitted).  Qualified immunity exists when a reasonable officer could have believed his conduct was lawful in light of clearly established law and the information he possessed.  Id.  Moreover, the plaintiff's subjective beliefs are irrelevant in determining whether the qualified immunity doctrine applies.  See Anderson v. Creighton, 483 U.S. 635, 636 (1987); Green v. City of Patterson, 971 F. Supp. 891, 901 (D.N.J. 1997).  The doctrine provides sufficient room for mistakes in the officers' judgment, and serves to protect "all but the plainly incompetent or those who knowingly violate the law."  Green, 971 F. Supp. at 901 (quoting Orsatti, 71 F.3d at 484) (further citations omitted).  In Harlow v. Fitzgerald, 457 U.S. 800 (1982), the Supreme Court established the standard for invoking a qualified immunity defense, stating that: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct

---

On the other hand, suits against officers acting in their official capacity should be treated as suits against the government entity itself "[b]ecause the real party in interest . . . is the governmental entity and not the named official, [and thus] 'the entity's policy or custom must have played a part in the violation of federal law.'"  Hafer, 502 U.S. at 25 (quoting Monell, 436 U.S. at 694) (further citation omitted).

The affirmative defense of qualified immunity was raised by Defendants in their Motion to Dismiss.  Only officers sued in their individual capacity are, however, entitled to assert qualified immunity as a defense.  See generally Owen v. City of Indep., 445 U.S. 622, 650–53 (1980).  In his Response, Keahey did not assert that the defense of qualified immunity did not apply because he was suing the officers in their official capacity, but rather opposed the qualified immunity defense on more substantive grounds.  Given that Keahey did not deny that he is suing the officers in their individual capacity, the Court will treat his claims against them as such.

In any event, even if Keahey did intend to sue the officers in their official capacity, this still would not change the outcome here.  As discussed above, in official capacity suits, the officers' actions are essentially suits against the affiliated government entity in and of itself.  The only immunities available to defendants in official-capacity actions are those that the governmental entity itself possesses.  Kentucky v. Graham, 473 U.S. 159, 167 (1985).  It is well established that municipalities are not entitled to qualified immunity.  Owen, 445 U.S. at 650.  Thus, to the extent that Keahey meant to sue the officers in their official capacity, their actions would be imputed to the Township and the Court addresses the merits of these claims in its discussion of municipal liability.

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818 (internal citations omitted).  In Saucier v. Katz, 533 U.S. 194 (2001), the Court refined this standard by formulating a two-pronged inquiry into the official's conduct: (1) whether, taken in the light most favorable to the plaintiff, the alleged facts indicate the deprivation of an actual constitutional right; and (2) if so, whether the right was clearly established such that a reasonable officer could have believed that the particular conduct at issue was lawful.  See id. at 201; see also Holmes v. Cnty. of Del., No. Civ.A.04-4794, 2007 WL 954122, at *4 (E.D. Pa. Mar. 28, 2007); Pagan v. Ogden, No. Civ.A.09-00002, 2010 WL 3058132, at *6 (E.D. Pa. July 30, 2010); Bergdoll v. City of York, No. Civ.A.1:08-01879, 2009 WL 25093, at *7–8 (M.D. Pa. Jan. 5, 2009). In Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court held that the sequence of the Saucier inquiry is not mandatory and that district courts should exercise their "sound discretion" in determining which prong to address first.  Id. at 236; see also Pagan, 2010 WL 3058132, at *6; Verdier v. Borough, 796 F. Supp. 2d 606, 630 (E.D. Pa. 2011).

The first prong of Saucier instructs the Court to consider whether the facts alleged by Plaintiff indicate that the officers' conduct violated a constitutional right.  Saucier, 533 U.S. at 201. As discussed above, Plaintiff has sufficiently stated claims based upon the officers' deprivation of his Fourth Amendment rights against seizure of his person and personal property, and his Fourteenth Amendment procedural due process rights.  As such, the first prong of Saucier is satisfied under these circumstances.

The second prong of Saucier requires the Court to consider whether the alleged constitutional rights were clearly established such that a reasonable officer could have believed that the particular conduct at issue was lawful.  Id.  "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."  Mitchell v. Forsythe, 472 U.S. 511, 526 (1985).  As succinctly stated

by one district court, "[t]he Fourth Amendment protection against unreasonable . . . seizures and the Fourteenth Amendment right to due process are clearly established laws." Gale v. Storti, 608 F. Supp. 2d 629, 634 (E.D. Pa. 2009); see also Gerhart v. Commonwealth of Pa., No. Civ.A. 09-1145, 2009 WL 2581715, at *5 (E.D. Pa. Aug. 13, 2009). Thus, the only remaining inquiry is whether the officers could have believed that their conduct was lawful in light of these clearly established constitutional rights. An assessment of whether the officers acted reasonably under these circumstances is a fact-intensive inquiry. See id., at *5. The initial step in assessing the constitutionality of the officers' actions is to determine all relevant facts. See id. (quoting Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009)). In doing so, courts should be mindful of the fact that "a decision on qualified immunity [can] be premature when there are unresolved disputes of . . . fact relevant to the immunity analysis." Id., at *5 (quoting Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002)).

In this case, there are simply too many unsettled facts present at this point in time in order for the Court to definitively decide whether the alleged constitutional violations by the officers were reasonable, thereby entitling them to the affirmative defense of qualified immunity. For example, Plaintiff asserts that the police did not have probable cause to seize his person. In assessing a § 1983 claim based upon such an allegation, "the proper inquiry is not whether the person committed the offense, but whether the arresting officers had probable cause to believe the person arrested committed the offense." Moleski v. Ross, No. Civ.A.09-1111, 2010 WL 2766891, at *4 (E.D. Pa. July 12, 2010) (internal citation omitted). Although officers acting pursuant to a valid warrant are generally determined to have probable cause, a warrant does not, in and of itself, shelter the officers from liability for false arrest. Holmes, 2007 WL 954122, at *3 (citing Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000)). Here, the officers did not have a warrant. Moreover, according to Plaintiff, upon demanded entry into his home, the officers determined that "no crime had been

17

committed," and that Keahey's wife was not in any danger, but nonetheless removed him.  (Am. Compl. ¶¶ 21–25.)  In response, the officers assert that they were responding to a 911 call made by Keahey's wife.  Neither Plaintiff nor the Defendants have established the content of this call or Wendy's basis for alerting the police in the first place.  Therefore, at this stage of the proceedings, the Court simply does not have enough information before it to determine whether or not the officers had probable cause to seize the Plaintiff under these circumstances.  Finally, in regards to Plaintiff's Fourth and Fourteenth Amendment claims related to the seizure and deprivation of his property, questions linger as to whether the officers' actions under the circumstances were reasonable or if there was a mistake in judgment predicated upon a mistaken understanding of the law.  Further discovery will no doubt bear out these inquiries.  Because the Court finds it necessary for these claims to proceed to the discovery phase, Plaintiff's claim cannot be dismissed on the basis of qualified immunity.  Thus, Defendants' Motion on these grounds is denied without prejudice to raise at a later stage in the litigation.

**B.** **Count III—Conspiracy to Deprive Plaintiff of His Constitutional Rights**

Plaintiff states that the officers engaged in a conspiracy to deprive him of his constitutional rights under the Fourth and Fourteenth Amendments and § 1983 (Am. Compl. ¶¶ 101–09.)  To properly make out a conspiracy claim, a plaintiff must allege: (1) the existence of a conspiracy involving state action; and (2) a deprivation of his civil rights in furtherance of the conspiracy by a party to the conspiracy.  Marchese v. Umstead, 110 F. Supp. 2d 361, 371 (E.D. Pa. 2000) (further citation omitted).  Moreover, the plaintiff must allege that there was an agreement, understanding, or meeting of the minds to violate the plaintiff's rights.  Startzell v. City of Phila., 533 F.3d 183, 205 (3d Cir. 2008).  In doing so, "[o]nly allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain other allegations

18

of the alleged conspirators taken to achieve that purpose will be deemed sufficient." Marchese, 110 F. Supp. 2d at 371 (internal citation and quotation omitted).

Although it is a close call, Plaintiff's claims that the Defendants engaged in a civil conspiracy to deprive him of his constitutional rights survive a motion to dismiss.  While Plaintiff has not directly identified which officers participated in the conspiracy, the definitive purpose of the conspiracy, or when they allegedly entered into this conspiracy,  he has provided more than a "mere incantation of the words 'conspiracy' [and] 'acted in concert[.]'" Loftus v. Se. Pa. Transp. Auth., 843 F. Supp. 981, 987 (E.D. Pa. 1994).  In the Amended Complaint, Keahey alleges that certain officers chose to "impermissibly become [ ] agent[s]" of his wife and "conspired" with her "in her desires to harm" him and deprive him of constitutional rights.  (Am. Compl. ¶¶ 103–07.)  To carry out these "desires," Plaintiff alleges that the Township "formed an impermissible symbiotic, unconstitutional, relationship" with Wendy.  (Id. at ¶¶ 108, 109.)  Moreover, Plaintiff points to certain actions taken in furtherance of the alleged conspiracy, such as repeatedly making threatening phone calls to him on his personal cell phone, and allowing Wendy to dictate how the officers conducted their investigations and what information they filed in their police reports.  (Id. at ¶¶ 103, 109.)  At this stage of the litigation and in viewing the facts in the light most favorable to Keahey, these allegations are sufficient to state a claim for conspiracy.  See Gale, 608 F. Supp. 2d at 635 (finding that plaintiff's allegations regarding landlord's contact with police prior to plaintiff's forcible eviction survived a motion to dismiss); Gerhart, 2009 WL 2581715, at *6 (finding that plaintiffs' allegations that police officers met with a third party sometime shortly before they were evicted from their home for the purpose of carrying out the alleged constitutional violations sufficiently stated a conspiracy claim); Piskanin v. Hammer, No. Civ.A.04-1321, 2005 WL 3071760, at *5 (E.D. Pa. Nov. 14, 2005) (finding that plaintiff's claims that at some point in the two weeks

prior to his arrest, a private party and a police officer agreed to falsely accuse him of a crime and the officer's subsequent submission of a false criminal complaint were sufficient to satisfy first element of a conspiracy).  As such, Defendants' Motion to dismiss this claim is denied.

### C.   Count IV[12]—False Imprisonment

In addition to his federal law claims, Keahey also brings a false imprisonment tort claim against the Defendants.  Specifically, Keahey claims that the officers' non-consensual removal of him from his home, placement in a police vehicle against his will, and relocation to another township with no means of transportation falsely imprisoned him. (Am. Compl. ¶¶ 111, 114–15.)  In response, Defendants assert that the officers' actions did not falsely imprison Keahey because he was never formally arrested, "locked up," or confined within fixed boundaries at any point in time.  (Def.'s Mot. to Dismiss Am. Compl. 10.)

To properly state a claim for false imprisonment under Pennsylvania state law, a plaintiff must prove that: (1) the defendant acted with the intent to confine the plaintiff within fixed boundaries; (2) the defendant's act directly or indirectly resulted in a confinement of the plaintiff; (3) the plaintiff was conscious of the confinement or harmed by it; and (4) the confinement was unlawful.  Joyner v. Sch. Dist. of Phila., 313 F. Supp. 2d 495, 502 (E.D. Pa. 2004) (internal citations omitted); Pennoyer v. Marriott Hotel Serv., Inc., 324 F. Supp. 2d 614, 620 (E.D. Pa. 2004) (internal citations omitted).  A confinement is unlawful if the defendant did not have probable cause to confine the plaintiff.  Joyner, 313 F. Supp. 2d at 502 (citation omitted).  Additionally, actions that have been recognized to constitute a confinement include the use of physical barriers or physical

---

[12] In his Complaint, Amended Complaint, and Response, Plaintiff refers to his false imprisonment claim as "Count IIII."  For clarity purposes, the Court addresses Keahey's false imprisonment claim as "Count IV."

force, submitting to a threat of physical force, and the taking of a person into custody under asserted legal authority. <u>Pennoyer</u>, 324 F. Supp. 2d at 620 (citing <u>Chicarelli v. Plymouth Garden Apartments</u>, 551 F. Supp. 532, 541 (E.D. Pa. 1982)) (further citation omitted).   A person is not falsely imprisoned, however, "[i]f there is a known, safe means of escape, involving only a slight inconvenience[.]" <u>Id.</u>

Plaintiff's allegations here are sufficient to constitute a claim of false imprisonment.   The officers used their legal authority to remove Plaintiff from his home.   They then placed him in the back of a locked patrol car, an area restricted by "fixed boundaries" and with no "known, safe means of escape." <u>Id.</u>   Indeed, the patrol car was locked and had no door handles.   Even after the officers released Keahey from the vehicle, their alleged stranding of him in a parking lot in a different township with no means of transportation is more than "a slight inconvenience." <u>Id.</u>   Moreover, Keahey was conscious of the confinement at all times, and claims that he suffered mental and emotional distress and "severe financial hardship" as a result.  (Am. Compl. ¶¶ 122–23.)   Finally, the Court already established above that it remains unknown at this stage of the proceedings whether the officers' actions here were based upon sufficient probable cause.   As such, it cannot yet be determined whether the confinement was unlawful.   Accordingly, the Court cannot grant Defendants' Motion on this ground.

###    D.      Count V—Harassment

Plaintiff asserts that the officers' actions here were "an outrageous and extreme abuse of a governmental power and the legal process," and that he therefore has a viable tort claim for harassment under Pennsylvania state law.   (Am. Compl. ¶ 130.)   Harassment is not, however, recognized as an independent cause of action in Pennsylvania.   <u>See Sher v. Upper Moreland Twp.</u>

Sch. Dist., No. Civ.A.11-1525, 2011 WL 3652474, at *13 n.23 (E.D. Pa. Aug. 19, 2011) (citing

DeAngelo v. Fortney, 515 A.2d 594, 596 (Pa. Super. 1986); Sobel v. Winguard, 531 A.2d 520,

522–23 (Pa. Super. 1987)).   Moreover, whether or not a state actor abused or misused his

governmental power is related to a denial of substantive due process.  See Cerino v. Towamensing

Twp., No. Civ.A.3:09-812, 2010 WL 411730, at *4 (M.D. Pa. Jan. 26, 2010) (citing Key Youth Serv.

v. City of Olathe, 38 F. Supp. 2d 914, 926 (D. Kan. 1999)).  The Court has already decided above

that Plaintiff has not sufficiently stated a cause of action based upon a denial of his substantive due

process rights under these circumstances.  As such, Defendants' Motion on these grounds is granted,

and Plaintiff's claims related to harassment are dismissed.

### E.    Count VI—Malicious Abuse of Process

Plaintiff claims that Defendants' actions constituted a "malicious abuse of process."  ( Am.

Compl. 20.)  As an initial matter, even under a liberal reading of Plaintiff's Amended Complaint,

it is unclear whether his malicious abuse of process claim is the basis of a § 1983 action or a state

law tort claim.  In one section of Count VI, Keahey asserts that the Township "had a duty under the

United States and Pennsylvania Constitutions . . . to act reasonably and fairly . . . and not abuse the

legal process." (Id. ¶ 137.)  At no point in Count VI, however, does Plaintiff mention § 1983 or any

particular sections of the United States Constitution on which such claims are based. Such

"threadbare" statements do not meet the standards put forth by the Supreme Court in Ashcroft v.

Iqbal, 129 S. Ct. 1937, 1949 (2007).  As such, to the extent that Plaintiff meant to assert a claim for

malicious abuse of process pursuant to § 1983, he has failed to properly do so.

Throughout the remainder of Count VI, Keahey makes various allegations that Defendants'

actions "constituted an abuse of the legal process pursuant to Pennsylvania Law," and were

"intentional, malicious, and outrageous."  (Am. Compl. ¶¶ 140, 143.)  Once again, however, Plaintiff's allegations are unclear as to whether he is asserting a claim based upon a "malicious use of process" or an "abuse of process."   The two actions are separate and distinct torts under Pennsylvania state law.  In <u>McGee v. Feege</u>, 535 A.2d 1020, 1023 (Pa. 1987), the Supreme Court of Pennsylvania recognized the distinction between the two torts, stating that:

> [T]here is often confusion in the two separate and distinct actions of malicious use of process and abuse of process. . . . An abuse [of process] is where the party employs it for some unlawful object, not the purpose which it is intended by the law to effect . . . On the other hand, legal process, civil or criminal, may be maliciously used so as to give rise to a cause of action where no object is contemplated . . . other than its proper effect and execution. . . . Malicious use of civil process has to do with the wrongful initiation of such process, while abuse of civil process is concerned with a perversion of a process after it is issued.

<u>Id.</u>  (internal citations omitted).  It is impossible to discern from Count VI which tort Keahey is alleging under these circumstances.  For example, he asserts that Defendants "*initiated* a series of multiple threats" against him that were "malicious" and "outrageous," lending to the interpretation of  his claims as an action for malicious use of process.  (Am. Compl. ¶¶ 139, 143 (emphasis added).)  On the other hand, Plaintiff also asserts that Defendants' continual "abuse [of] the legal process" was a result of "police powers empowered to them" and that their alleged "malicious" and "outrageous" threats constituted harassment.  (<u>Id.</u> ¶¶ 137, 142.)  It is unclear from Count VI whether Keahey meant to bring a claim for malicious use of process, abuse of process, or even another attempt to assert a claim for harassment.  A proper claim under Rule 12(b)(6) "requires more than labels and conclusions[.]"  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007); <u>Iqbal</u>, 129 S. Ct. at 1949–50.  Therefore, Plaintiff's claims for "malicious abuse of process" are dismissed.

F.     **Punitive Damages**

Plaintiff requests punitive damages against all Defendants as to every claim.  In their Motion, Defendants argue that Plaintiff is not entitled to recover punitive damages as to any claim in this matter.

1.     **Section 1983 Claims**

In <u>City of Newport v. Fact Concerts</u>, 453 U.S. 247, 271 (1981), the Supreme Court held that municipal governments may not be sued for punitive damages under § 1983.  Thus, Keahey is precluded from recovering any punitive damages from the Township.  The Supreme Court has concluded, however, that punitive damages may be recovered from individual officers if their actions were "motivated by evil motive or intent, or . . . involve[d] reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983).  As noted in <u>Russoli v. Salisbury Twp.</u>, 126 F. Supp. 2d 821 (E.D. Pa. 2000), "[t]he objective standard of 'callous or reckless indifference' that suffices for an award of punitive damages is not far removed from the standard for denying qualified immunity to the officers—whether a reasonable officer would have known that his conduct violated a clearly established constitutional right.  Therefore any claim . . . that would result in our denying qualified immunity could also be the basis for punitive damages." <u>Id.</u> at 873.  Whether or not punitive damages are appropriate against the individual officers depends upon the circumstances surrounding the officers' actions and their state of mind at the time of the alleged constitutional deprivations.  Thus, Defendants' Motion to Dismiss Plaintiff's claims for punitive damages pursuant to federal constitutional violations and § 1983 is too premature for the Court to consider.

24

2.        **State Law Claims**

The legal standard for punitive damages for state law claims is a matter of state law.  See

Griffiths v. CIGNA Corp., 857 F. Supp. 399, 409–10 (E.D. Pa.1994), aff'd, 60 F.3d 814 (3d

Cir.1995) (further citation omitted).  The Supreme Court of Pennsylvania has adopted Section 908(2)

of the Restatement (Second) of Torts, which allows punitive damages for "conduct that is outrageous

because of the defendant's evil motive or his reckless indifference to the rights of others." Rizzo v.

Haines, 555 A.2d 58, 69 (Pa. 1989) (quoting Rest. (2d) Torts § 908(2) (1977)).  "A court may award

punitive damages only if the conduct was malicious, wanton, reckless, willful, or oppressive." Id.

(citing Chambers v. Montgomery, 192 A.2d 355, 358 (Pa. 1963)).  Moreover, the tortfeasor's state

of mind is also relevant, and his actions must have been intentional, reckless, or malicious.  Russoli,

126 F. Supp. 2d at 874.

The Court has dismissed Plaintiff's state law claims for harassment and malicious abuse of

process.  This leaves Keahey's false imprisonment claim.  In Count IV, Keahey specifically asserts

that Defendants' conduct was motivated by an evil motive or intent "improperly based upon his

gender" and resulted in the malicious, intentional, reckless, and callous indifference to his rights.

(Am. Compl. ¶¶ 121, 125.)  Moreover, as stated above, the officers' states of mind and motivation

behind their actions remain unknown at this point in time, and will no doubt be determined during

the discovery process.  As such, whether punitive damages are appropriate for Keahey's false

imprisonment claim survives a motion to dismiss.

IV.    **CONCLUSION**

For the reasons set forth above, the Court finds that Defendants' Motion to Dismiss

Plaintiff's Amended Complaint is granted in part and denied in part.

An appropriate Order follows.