# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GEORGE B. KEAHEY,             :
                                 :     CIVIL ACTION
             Plaintiff,         :
       v.                     :
                                 :     NO.  11-7210
BETHEL TOWNSHIP,          :
PENNSYLVANIA, et al.,       :
                                 :
            Defendants.     :

## MEMORANDUM

BUCKWALTER, S.J.                              December 13, 2012

Currently pending before the Court is the Motion for Summary Judgment of Defendants Bethel Township, Lieutenant William Coyle, Corporal Christopher Kimball, Patrol Officer Brian Buck, Patrol Officer James Register, Detective Russell Mervine, Patrol Officer Sean Bradshaw, and Patrol Officer Lou Stackeni.  For the following reasons, the Motion is granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This action arises out of a series of incidents that occurred between the Plaintiff, George B. Keahey ("Plaintiff" or "Keahey") and several police officers of the Bethel Township Police Department in Delaware County, Pennsylvania.

On the evening of November 25, 2009, the Bethel Police received a call from Wendy Keahey, the Plaintiff's wife, concerning a domestic dispute at their residence, 1584 Conchester Road.  (Defs.' Mot. Summ. J., Ex. 3, Police Report of November 25, 2009 ("Nov. 25 Police Report").)  Officers James Register and Brian Buck responded to the call.  (Id.)  The officers arrived in different cars, and they observed that there were two vehicles parked outside the

residence, a Ford F150 truck and a 1987 Mustang.  (Id.; Defs.' Mot. Summ. J. Ex. 4, Deposition

of Brian Buck ("Buck Dep."), 42:6–10, June 20, 2012.)  Officer Buck described the couple as

being "verbally combative upon [their] arrival."  (Police Report; Buck Dep. 52:2–6.)  According

to Officer Register, Wendy Keahey was "heated" and "agitated" upon the officers' arrival, the

couple was arguing, and Wendy Keahey was "adamant" that she wanted her husband out of the

house.  (Defs.' Mot. Summ. J., Ex. 5, Deposition of James Register ("Register Dep."), 25:1–7,

May 23, 2012.)   The officers then separated the couple to question them separately.  (Buck Dep.

53:2–7; Register Dep. 25:12–19.)  Ms. Keahey informed Officer Buck that the mortgage to the

property was in her name and that the F150 truck and 1987 Mustang were titled solely in her

name.  (Buck Dep. 53:17–23.)  When asked by Officer Buck if she had somewhere else she could

go, Wendy Keahey replied that she did not.  (Nov. 25 Police Report; Buck Dep. 57:2–18.)

Officer Register asked George Keahey if he had somewhere else he could go, and Mr. Keahey

stated he had a friend's house to which he could go and voluntarily agreed to do so.  (Buck Dep.

57:21–58:18.)  Wendy Keahey refused to let her husband take the F150 truck and suggested that

he contact Irene Reardon, a woman Mr. Keahey was allegedly seeing, and ask her for a ride.

(Nov. 25 Police Report; Register Dep. 30:13–21.)

      Mr. Keahey describes a different scene.  He states that his wife was "very inebriated" and

"really looped" when the officers arrived.  (Defs.' Mot. Summ. J., Ex. 2, Deposition of George

Keahey ("Keahey Dep."), 29:24–30–1; 32:21–23, Sep. 17, 2012.)  He also states that, while his

wife was angry that he would not give her the keys to the Ford F150 as a result of her

intoxication, he would not classify the situation as an "argument."  (Id. at 31:15–20.)  He also

claims that he had been home from work for only ten minutes and was just sitting down to eat

when the police arrived.  (Id. at 33:2–7.)  Mr. Keahey says that Officer Buck said to him, "One of

you has to leave.  You both can't stay in the house tonight."  (Id. at 40:11–15.)  He was also told

that he would be unable to take the F150 truck or the Mustang to leave because they were his

wife's vehicles.  (Id. at 40:22–42:20.)  Finally, Officer Register told Mr. Keahey that he was

going to take him in his police car, and asked if Keahey wanted to get his coat.  (Id. at 43:5–16.)

Mr. Keahey was eventually taken by Officer Register in his police car and dropped off at

a nearby McDonald's restaurant.  (Nov. 25 Police Report; Buck Dep. 60:10–17; Register Dep.

34:1–11; Keahey Dep. 47:21–48:15.)  At the time, Keahey states that he felt he was under arrest

"in a legal sense," and felt this way because he was going to get in the front seat of the car but

was told he needed to sit in the back seat.  (Keahey Dep. 45:7–10; 46:11–14.)  He also believed

Officer Register was taking him to the police station and not a McDonald's.  (Id.  at  46:1–14;

46:24–48:9.)  Keahey states that, when dropped off, he asked Officer Register if he could go back

to his house, and Officer Register told him no and that he could not go back until his wife says he

could go back.  (Id. at 48:10–15.)  After remaining at the McDonald's restaurant for over forty

minutes, Mr. Keahey was eventually picked up and given a ride by Ms. Reardon.  (Id. at

49:3–51:5.)  He was then taken to another friend's house where he spent the night.  (Id. at

51:6–13.)

Mr. Keahey returned to the property the next morning.  (Id. at 52:10–53:4.)  When his

wife discovered he had returned, she "started screaming," and Mr. Keahey took the Ford F150

truck and left.  (Id.)  The Bethel Police Department then received another call from Wendy

Keahey.  (Defs.' Mot. Summ. J., Ex. 3, Police Report of November 26, 2009 ("Nov. 26 Police

Report").)  Officers Sean Bradshaw and Detective Russ Mervine responded to the call, and were

3

told by Mrs. Keahey that her husband had returned to the property and driven off with the truck. (Nov. 26 Police Report, Defs.' Mot. Summ. J., Ex. 7, Deposition of Sean Bradshaw ("Bradshaw Dep."), 23:14–22, May 23, 2012; Defs.' Mot. Summ. J., Ex. 8, Deposition of Russell Mervine ("Mervine Dep."), 33:11–22, June 28, 2012.)  Mrs. Keahey informed Officer Bradshaw and Detective Mervine of the previous night's events, told them that her husband did not have her permission to use the truck, and that she did not want to file charges against her husband but wanted the truck returned.  (Nov. 26 Police Report; Bradshaw Dep. 23:14–22.)  Officer Bradshaw called Mr. Keahey and left him a message informing him that his wife wanted the truck returned.  (Nov. 26 Police Report; Bradshaw Dep. 46:22–47:5.)  Keahey returned the call later and spoke with Detective Mervine.  (Nov. 26 Police Report.)  He told Detective Mervine that he did not have to return the truck and was not planning on doing so.  (Id.; Keahey Dep. 54:6–13.)  Later that day, a "stop and hold" order was placed on the truck.  (Nov. 26 Police Report.)  Officer Bradshaw informed Wendy Keahey of the order and that the police would be on the lookout for the truck.  (Id.)

The following day, Officer Bradshaw consulted the Delaware County District Attorney's Office and was told that Mr. Keahey would most likely be allowed to take the truck because it would be considered marital property.  (Id.)  Officer Bradshaw contacted Ms. Keahey and informed her that she would have to contact her divorce lawyer if she wanted to get the truck back.  (Id.)  He then removed the "stop and hold" order which was placed on the truck.  (Id.; Bradshaw Dep. 63:10–15.)

On January 23, 2010, upon discovering the truck parked outside the home of Irene Reardon, Ms. Keahey took the truck and parked it at a new location.  (Defs.' Mot. Summ. J., Ex.

4

3, Police Report of January 23, 2010 ("Jan. 23 Police Report").)  Upon discovering that the
vehicle was missing from the driveway, Mr. Keahey called the Bethel Police and spoke with
Corporal Christopher Kimball.  (Keahey Dep. 61–62; Jan. 23 Police Report.)  Mr. Keahey
demanded the truck be returned to him, and informed Corporal Kimball that the truck contained
personal belongings and items he needed for his legal practice.  (Keahey Dep. 63:3–13; Jan. 23
Police Report.)  He also informed Corporal Kimball that he had a court order allowing him to use
the truck.  (Jan. 23 Police Report; Defs.' Mot. Summ. J., Ex. 9, Deposition of Christopher
Kimball ("Kimball Dep.") 44:19–45:7, May 22, 2012.)  On the same day, Wendy Keahey called
the Bethel Police and informed Corporal Kimball that Irene Reardon had called her and
threatened her.  (Jan. 23 Police Report; Kimball Dep. 72:15–74:17.)  She also informed Corporal
Kimball that she would return her husband's personal belongings and items needed for his law
practice, but she would not return the truck.  (Jan. 23 Police Report; Kimball Dep. 64:14–18.)
Corporal Kimball then called Mr. Keahey and informed him that his belongings would be
returned by his wife to the police department, where he could retrieve them the following
morning.  (Jan. 23 Police Report; Kimball Dep. 67:16–68:13.)  Mr. Keahey told Corporal
Kimball in response that he wanted his wife charged with theft.  (Jan. 23 Police Report; Kimball
Dep. 45:8–21.)  He also informed Corporal Kimball that he wanted his belongings back by noon
that day and that Corporal Kimball should arrest his wife.  (Jan. 23 Police Report; Kimball Dep.
45:8–21.)  Corporal Kimball responded that if he wanted his wife charged with theft, he needed
to contact the police where the alleged theft took place—Aldan Borough.  (Jan. 23 Police
Report.)

     The following day, Lieutenant William Coyle contacted Mr. Keahey to inform him that

his wife had dropped off his personal belongings from the truck and that he could pick them up. (Defs.' Mot. Summ. J., Ex. 3, Police Report of January 24, 2010 ("Jan. 24 Police Report").)  Mr. Keahey responded to Lieutenant Coyle that he wanted to apologize for being argumentative the previous day with Corporal Kimball.  (Jan. 24 Police Report.)  Also on January 24, an unnamed Bethel officer was contacted by an Aldan Borough officer reporting that Mr. Keahey had called about having his wife charged with theft, noting that he had a court order authorizing his use of the truck.  (Jan. 24 Police Report.)

On February 17, 2010, the Delaware County Court of Common Pleas entered an order permitting Mr. Keahey to use what was identified as "Wendy Keahey's 1987 Mustang" for a period of thirty days, "at which time he shall return the vehicle to Wendy Keahey without further proceeding."  (Defs.' Mot. Summ. J., Ex. 10, February 17, 2010 Court Order ("Feb. 17 Order").)  Thirty days later, on Friday, March 19, Wendy Keahey called and spoke with Officer Buck and informed him that the thirty-day period had expired and he had not returned the Mustang.  (Buck Dep. 68:1–12.)  Officer Buck spoke with Mr. Keahey the following day, and Mr. Keahey told him that there was a "stay order" relating to the use of the Mustang and that he was able to continue using it.  (Id. at 79:20–80:3.)  Officer Buck asked Keahey to fax or hand deliver a copy of the stay, but he refused to do so.  (Id. at 79:20–80:3.)  As a result, Officer Buck placed a "stop and hold" order on the 1987 Mustang.  (Id. at 77:16–82:21.)  Officer Buck also consulted the District Attorney's Office, who informed him that he could charge Keahey with unauthorized use of a motor vehicle.  (Buck Dep. 82:16–21.)  After this exchange, Officer Buck had the stop and hold order removed from the Mustang on March 23.  Keahey was never arrested for his use of the Mustang.  (Keahey Dep. 70:4–5.)

6

Keahey filed the current action on November 18, 2011 bringing six counts: (1) seizure and detention without probable cause in violation of 42 U.S.C. § 1983; (2) seizure and deprivation of property in violation of § 1983; (3) conspiracy to deprive Plaintiff of his rights under § 1983; (4) false imprisonment; (5) harassment; and (6) malicious abuse of process.  After Defendants filed a Motion to Dismiss, the harassment and malicious abuse of process claims (Counts V and VI) were dismissed, leaving the § 1983 claims, the conspiracy claim, and the false imprisonment claim.  After discovery was completed, Defendants filed the immediate Motion for Summary Judgment on October 4, 2012 to dismiss the remaining counts.  Plaintiff filed a Response in Opposition on October 24, Defendants filed a Reply Brief on November 8, and Plaintiff a Sur-reply on November 14.  In his Response, Plaintiff agreed to drop the conspiracy claim and all claims against Detective Mervine, Officer Bradshaw, Officer Stackeni, and the John Doe defendant.  The Court now considers the merits of the Motion on the remaining claims.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the

disputed evidence and decide which is more probative, or to make credibility determinations.
Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA
Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court
must consider the evidence, and all reasonable inferences which may be drawn from it, in the
light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg
Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the
evidence presented by both sides, the court must accept as true the allegations of the non-moving
party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact,
it need not "support its motion with affidavits or other similar materials negating the opponent's
claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing
out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at
325.  Once the movant has carried its initial burden, the opposing party "must do more than
simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec., 475
U.S. at 586.  "[T]he non-moving party must rebut the motion with facts in the record and cannot
rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley
Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).  If the non-moving party "fails to
make a showing sufficient to establish the existence of an element essential to that party's case,
and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex,
477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant
will not be adequate to support a denial of a motion for summary judgment; there must be

enough evidence to enable a jury to reasonably find for the non-movant on that issue.  <u>Anderson</u>, 477 U.S. at 249–50.

## III.  DISCUSSION

Defendants move for summary judgment on (1) the § 1983 claims against the individual officers under a qualified immunity theory; (2) all claims against the Township under a municipal liability theory; and (3) the false imprisonment claim for failing to meet the required elements.

### A.    Qualified Immunity

The Township first seeks to dismiss the claims against the remaining individual officers under a qualified immunity theory.  Qualified immunity provides that government officials are immune from suits for civil damages under 42 U.S.C. § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Messerschmidt v. Millender</u>, 132 S. Ct. 1235, 1244 (2012) (quotations omitted). This doctrine attempts to balance the competing values of protecting innocent individuals from litigation while allowing liability for those who abuse their discretion.  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 814 (1982).  The qualified immunity analysis is specific to each individual defendant and considers the totality of the circumstances at the time of the defendant's challenged conduct. <u>Curley v. Klem</u>, 499 F.3d 199, 207 (3d Cir. 2007).

The qualified immunity inquiry is a question of law consisting of two prongs to be considered in any order.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009).  The first question is "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right."  <u>Id.</u> at 232 (internal citation omitted).  The second inquiry asks "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  <u>Id.</u>  "A Government

official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'. . .We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Pearson, 555 U.S. at 244 (internal quotation marks omitted).  The court must consider "the information within the officer's possession at that time."  Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 194 (3d Cir. 2005) (citing Anderson, 483 U.S. 635).

Keahey brings § 1983 claims (Counts I and II) against Lieutenant Coyle, Officer Register, Officer Buck, and Corporal Kimball.[1]

### 1.       Officer Register and Officer Buck

Keahey's brings claims against Officers Register and Officer Buck for unconstitutional seizure of person and property.

### a.       Seizure of Person

Broadly stated, the Fourth Amendment[2] prohibits the unreasonable seizure of a person

---

[1]The Amended Complaint does not specify to which officers each of the individual Counts apply.  It appears from the facts that Keahey is bringing a claim against Officers Register and Buck for unconstitutional seizure of person and against Officers Register and Buck and Corporal Kimball for unconstitutional seizure of property.

[2] "The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons . . . to be seized."  U.S. Const. amend. IV.

absent a judicially-sanctioned warrant supported by probable cause.[3]  See Orsatti v. N.J. State Police, 71 F.3d 480, 482 (3d Cir. 1995).  "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"  Kaupp v. Texas, 538 U.S. 626, 629 (2003) (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991); Michigan v. Chesternut, 486 U.S. 567, 569 (1988)).  The Supreme Court has articulated numerous examples of circumstances that constitute a "seizure" within the context of the Fourth Amendment, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."  Kaupp, 538 U.S. at 630 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).

Although there is a factual dispute as to what happened, even if the facts are taken in a light most favorable to Mr. Keahey, there is no indication that Officer Register violated a a clearly established constitutional right.  Although Mr. Keahey states that he was forced to leave, his own testimony suggests conflicting facts.  According to Keahey, when the officers arrived, Mrs. Keahey was in an intoxicated and loopy state.  After speaking with both Mr. and Mrs. Keahey, Officer Buck stated that "one of them" had to leave.  The officers were willing to let Mr. Keahey leave on his own accord by using the Mustang until Mrs. Keahey told them the Mustang was hers and that he could not take it.  Officer Register then told Mr. Keahey he would take him

---

[3] The Fourth Amendment is made applicable to the states through the Fourteenth Amendment.  See Albright v. Oliver, 510 U.S. 266, 272–73 (1994) (citing Mapp v. Ohio, 367 U.S. 643 (1961)) (further citation omitted).

in his police car and asked him if he wanted to get a coat.  Keahey was never handcuffed.  He

was placed in the backseat of Officer Register's police car because he had no other means of

transportation available to him—his wife stated she owned the F150 and Mustang and refused to

let him use them.  In the whole process, the officers used no physical force against Keahey.  The

officers never displayed a weapon.  Even taking the facts in a light most favorable to Keahey, a

reasonable jury could not find that a constitutional right was clearly violated.  Thus, the officers

cannot be found to have known this so clearly such that their actions fall outside the scope of

qualified immunity.

### b.     Seizure of Property

The Fourth Amendment also protects individuals from unreasonable seizures of their

property.[4]  "[A] Fourth Amendment 'seizure' of personal property occurs when 'there is some

meaningful interference with an individual's possessory interests in that property.'"  Brown v.

Muhlenberg Twp., 269 F.3d 205, 209 (3d Cir. 2001) (quoting United States v. Jacobsen, 466

U.S. 109, 113 (1984)); see also Gale v. Storti, 608 F. Supp. 2d 629, 633 (E.D. Pa. 2009).  When

analyzing whether or not such an interference occurred, "it is irrelevant that the officers do not

currently have custody of the property," so long as "the officers participated in the seizure as

alleged."  Id. at 633.  In Gale, several police officers assisted a landlord in the eviction of a

tenant.  Id. at 632.  The officers entered the premises without the tenant's consent and instructed

him to vacate the property immediately or else risk being arrested for trespassing.  Id.  The police

_____

[4] "The right of the people to be secure in their . . . houses, papers, and effects, against
unreasonable . . . seizures, shall not be violated, and no Warrants shall issue, but upon probable
cause, supported by Oath or affirmation, and particularly describing the . . . things to be seized."
U.S. Const. amend. IV.

also stood by as the landlord changed all the locks on the property.  Id.  The tenant ultimately

vacated the premises, but never retrieved $50,000 worth of his personal property.  Id.  He

therefore sued the officers and the municipality, claiming that the officers illegally seized his

property in violation of the Fourth and Fourteenth Amendments.  Id. at 633.  The court agreed,

stating that, even though the officers themselves did not actually change the locks or retain

custody of the tenant's property, their participation in the alleged conduct was enough to

constitute an unreasonable seizure of property for purposes of surviving a motion to dismiss.  Id.

at 633–34.

      Plaintiff alleges that Officers Register and Buck illegally seized his property by removing

him from his home and instructing him that he could not return and by refusing to allow him the

use of the F150 or Mustang.  Again, even if the facts are taken in a light most favorable to

Keahey, there is nothing to suggest that the officers actions were so blatantly unconstitutional

such that no reasonable officer would have taken them.  The evidence suggests that Mrs. Keahey

allowed the officers into the home.  Thus, unlike in Gale, the officers had consent to enter the

house.  Also, under Mr. Keahey's version of the facts facts, the officers stated that it was a

volatile situation, that Mrs. Keahey was intoxicated, that she indicated the house and the cars

were in her name, and Officer Buck stated that one of the two had to leave.  Mrs. Keahey

maintained that the vehicles were solely in her name and that Mr. Keahey could not use them.

Thus, the Officers actions do not fall outside the scope of qualified immunity.


      **2.**        **Corporal Kimball**

      Keahey's claim against Corporal Kimball appears to be for unconstitutional seizure of

property stemming from (1) an unreasonable failure to retrieve the F150 truck from Mrs. Keahey after she took it from the Reardon's driveway and (2) Kimball's failure to return Keahey's personal items from the back of the truck in a "reasonable time."  Keahey claims that Corporal Kimball should have been aware of the Delaware County District Attorney's Office order that Keahey was legally entitled to the truck, and by refusing to force Mrs. Keahey to return the truck, Corporal Kimball ignored the order.  This argument mis-characterizes the facts in the record.  As an initial point, the police report in which Officer Bradshaw summarized the discussion with the District Attorney's Office is absent from the record.[5]  According to Keahey, Officer Bradshaw spoke with the District Attorney's Office and was told that Keahey had a right to drive the F150 truck, as it would likely be considered marital property.  Setting aside the fact that such a claim is hearsay, even if it were accepted as true, the District Attorney's Office did not say that Mrs. Keahey had *no* rights to the vehicle.  It was only stated that the vehicle was marital property.  Thus, Corporal Kimball cannot be held to have materially interfered with Kimball's constitutional property right to the F150 truck.

Keahey also claims that Corporal Kimball is liable because his personal items in the back of the truck—namely his cell phone, client records, and suit jacket—were not returned in a timely and reasonable fashion after the truck was taken by Mrs. Keahey.  Again, the factual record does not support this contention.  After Mr. Keahey informed Corporal Kimball of the missing items, Corporal Kimball immediately called Mrs. Keahey, informed her of the situation, and requested the items be returned.  According to the record, Mr. Keahey's items were returned

---

[5]Keahey claims that Defendants refused to turn over the report and other records in discovery and, as a result, he should be entitled to an inference in his favor.  However, this Court denied Keahey's earlier Motion to Compel on this same issue.

to the police station by Mrs. Keahey the following day, where he was able to retrieve them. There is no indication that Corporal Kimball or any other officers meaningfully interfered with Keahey's property rights in those items.  Aside from charging his wife with theft, Mr. Keahey has not demonstrated any other action that Corporal Kimball or the other officers should have taken.  As for charging his wife with theft, Corporal Kimball told Mr. Keahey that if he wanted to do so he needed to contact the police in Aldan Borough where the alleged theft took place. The Motion is therefore granted as to Corporal Kimball and he is dismissed as a defendant in the case.

### 3.      Lieutenant Coyle

Keahey's claim against Lieutenant Coyle does not appear to allege unconstitutional seizure of person or property.  Rather, the claim against Lieutenant Coyle stems from the fact that he was placed in charge of an investigation into whether or not Keahey's civil rights were violated, and there is a question as to whether or not this investigation took place.  Besides the fact that there is no indication in the Amended Complaint that Keahey is bringing such a claim, Keahey did not have a clearly established constitutional right to an investigation.  As such, the Motion is granted and Lieutenant Coyle is dismissed as a defendant.

### C.     Municipal Liability

In the seminal case of <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978), the United States Supreme Court confirmed that "Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies," but emphasized that, "a municipality cannot be held liable under § 1983 on a respondeat superior theory."  <u>Id.</u> at 690–91 (emphasis in original).  To establish section 1983 liability on such a governing body, the

plaintiff must identify either a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." Id.  A policy is shown when "a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (quoting Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990)).  A custom is defined as "'such practices of state officials so permanent and well-settled as to constitute law,'" which can be established by showing the policy maker's knowledge and acquiescence to the custom.  Id. (quoting Andrews, 895 F.2d at 1480).  Alternatively, a custom or policy may be established from a failure to train, supervise, or otherwise act, where that failure reflects a deliberate indifference of officials to the rights of persons that come into contact with these municipal employees.  City of Canton v. Harris, 489 U.S. 378, 388 (1989); Reitz v. Cnty. of Bucks, 125 F.3d 139, 145 (3d Cir. 1997).  As succinctly summarized by the Third Circuit, three situations exist where acts of a government employee are deemed to be the result of a policy or custom of the governmental employer, thereby rendering the entity liable under § 1983:

> The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. . . .  The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. . . .  Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotation

marks and citations omitted).

Beyond identification of a policy or customary failure to act, establishment of section 1983 municipal liability requires a showing of causation.  "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality."  Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997).  Rather, the plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  Id.; see also Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (plaintiff carries burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the constitutional deprivation challenged).  The standard of causation is stringent and requires that "the identified deficiency . . . be closely related to the ultimate injury."  Canton, 489 U.S. at 391.

Defendants move to dismiss the Township as a defendant by arguing there is no established custom or policy of a failure to train the officers in how to handle a domestic dispute such that it would lead to deprivations of civil rights.  Keahey responds that the Township has demonstrated an inadequacy in domestic dispute training which favors female citizens in such disputes.  Keahey bases this conclusion on (1) the testimony of Officer Bradshaw, Officer Register, Officer Buck, and Lieutenant Coyle that they did not receive specific training on how to handle domestic calls and (2) a report from former Police Chief Cairo to the Bethel Township Board of Supervisors that a decrease in police budget would lead to a reduction in training and that "[t]he primary reasons plaintiffs take legal action against Municipalities and Police Departments is failure to train, and failure to supervise."

17

The evidence does not demonstrate a specific policy or failure to train.  Even if the facts above are taken in a light most favorable to Keahey, they do not reflect an obviously inadequate policy likely to result in the deprivation of Constitutional rights.  As noted above, genuine questions remain as to whether there were, in fact, constitutional violations in this case.  Even if there were, however, Keahey has failed to demonstrate that they were directly caused by a failure to train, that a failure to train led to a favoring of female citizens in responding to a domestic dispute, or that this type of incident is a regular occurrence within the Township.  His claim that "[a] jury could clearly infer from the facts" that his rights were deprived pursuant to "some paternalistic favoritism of protecting females over males" simply does not demonstrate the requisite causation needed to meet the stringent standard.

### D.      False Imprisonment

Keahey's final remaining claim is for the state law tort of false imprisonment.  To properly state a claim for false imprisonment under Pennsylvania state law, a plaintiff must prove that: (1) the defendant acted with the intent to confine the plaintiff within fixed boundaries; (2) the defendant's act directly or indirectly resulted in a confinement of the plaintiff; (3) the plaintiff was conscious of the confinement or harmed by it; and (4) the confinement was unlawful.  Joyner v. Sch. Dist. of Phila., 313 F. Supp. 2d 495, 502 (E.D. Pa. 2004) (internal citations omitted); Pennoyer v. Marriott Hotel Servs., 324 F. Supp. 2d 614, 620 (E.D. Pa. 2004) (internal citations omitted).  A confinement is unlawful if the defendant did not have probable cause to confine the plaintiff.  Joyner, 313 F. Supp. 2d at 502 (citation omitted). Additionally, actions that have been recognized to constitute a confinement include the use of physical barriers or physical force, submitting to a threat of physical force, and the taking of a person into custody under asserted

legal authority.  Pennoyer, 324 F. Supp. 2d at 620 (citing Chicarelli v. Plymouth Garden

Apartments, 551 F. Supp. 532, 541 (E.D. Pa. 1982)) (further citation omitted).  A person is not

falsely imprisoned, however, "[i]f there is a known, safe means of escape, involving only a slight

inconvenience[.]"  Id.

 Defendants move to dismiss this claim because there is no indication that the elements of

the claim are met.  The Court agrees.  The only defendants in the case who are potentially liable

are Officers Register and Buck.  As suggested above in the discussion above regarding seizure of

person, there is no indication that Officers Register and Buck intended to confine Mr. Keahey in

a bounded area.  While Officer Register gave Keahey a ride in his police car, this was merely

done because Keahey had no other means of transportation, as his wife would not allow him to

take either the F150 or the Mustang.

 Alternatively, although not raised by either party, the Court recognizes that the officers

would be immune under the Political Subdivision Tort Claims Act, 42 Pa. C.S. § 8541 et. seq.

The Tort Claims Act provides, in pertinent part, that "no local agency shall be liable for any

damages on account of any injury to a person or property caused by any act of the local agency or

any employee thereof or any other person."  Id.  Pursuant to that statute, municipal entities and

their employees acting in their official capacities are generally immune from tort liability based

on negligence unless the alleged misconduct fits into one of the few narrow categories[6]

---

 [6]The eight statutory exceptions to immunity in Section 8542(b) of the Tort Claims Act
are: (1) the operation of a motor vehicle; (2) the care, custody or control of personal property; (3)
the care, custody or control of real property; (4) a dangerous condition of trees, traffic signs, or
other traffic controls; (5) a dangerous condition of utility service facility; (6) a dangerous
condition of streets; (7) a dangerous condition of sidewalks; and (8) the care, custody or control
of certain animals.  42 Pa. C.S. § 8542(b)(1-8).

enumerated in the statute—none of which apply here.  <u>Bright v. Westmoreland Cnty.</u>, 380 F.3d 729, 750 (3d Cir. 2004); <u>Townsley v. W. Brandywine Twp.</u>, No. Civ.A.06-728, 2006, 2006 WL 1147267, at *8 (E.D. Pa. Apr. 26, 2006).

## IV.    CONCLUSION

In light of the foregoing, the Court grants Defendant's Motion for Summary Judgment in its entirety.  The Motion is granted as to Officers Register and Buck, as they are protected by qualified immunity even if the facts are taken in a light most favorable to Plaintiff.  The Motion is also granted as to claims against Corporal Kimball, as there is no evidence in the record from which a reasonable jury could find that he deprived Plaintiff of any constitutional property rights. The Motion is granted as to Lieutenant Coyle, as Plaintiff was not constitutionally entitled to any investigation into the incident and, in any event, did not adequately plead such a claim in the Amended Complaint.  Defendant's Motion for Summary Judgment is also granted as to claims against Bethel Township.  Plaintiff has not sufficiently demonstrated a policy or practice that led to a violation of Constitutional rights.  Finally, Defendant's Motion is granted as to the tort of false imprisonment, as the record does not indicate an intent on the officers to confine Mr. Keahey and, in the alternative, the claim is foreclosed by the Pensnylvania Political Subdivision Tort Claims Act.

An appropriate Order follows.